```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
                   FORT WORTH DIVISION
```

KAREN GEARY, ET AL              §
                                §
VS.                             §   CIVIL ACTION NO.4:06-CV-268-Y
                                §
LIFE INVESTORS INSURANCE        §
COMPANY OF AMERICA              §

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Karen Geary has filed suit on behalf of her mother, Dorothy Lindquist, against defendant Life Investors Insurance Company of America ("Life Investors") asserting various claims all based on Life Investor's failure to pay daily benefits under a long-term-care insurance policy ("the Policy") for Lindquist's stay at The Cottages at Clear Lake ("the Cottages") facility. The question presented to the Court is whether the Cottages qualifies as a nursing-home facility as defined by the Policy. Life Investors has filed a motion (doc. #25) for summary judgment contending that the Cottages is not a nursing home as defined by the Policy. After review of the pleadings and appendices, the Court concludes that the Cottages is not a nursing home as defined by the Policy and therefore Life Investor's motion should be GRANTED.

I.  Factual Background

In March 1991, Life Investors issued a long-term-care insurance policy to Dorothy Lindquist. The Policy provides for a "nursing-home benefit" of fifty dollars per day for an inpatient

stay in a nursing home for an unlimited period of time after a deductible period of 100 days. (Def.'s App. at 26.) The Policy defines "Nursing Home" as:

> A facility or distinctly separate part of a hospital or other institution which is licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients and:
>
> - Provides 24 hour a day nursing service under a planned program of policies and procedures which was developed with the advice of, and is periodically reviewed and executed by, a professional group of at least one Doctor and one Nurse; and
> - Has a Doctor available to furnish medical care in case of emergency; and
> - Has at least one Nurse who is employed there full time . . .; and
> - Has a Nurse on duty or on call at all times; and
> - Maintains clinical records for all patients; and
> - Has appropriate methods and procedures for handling and administering drugs and biologicals.
>
> NOTE: The above requirements are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities as well as some specialized wards, wings and units of hospitals. Those requirements are generally NOT met by: rest homes; homes for the aged; sheltered living accommodations; residence homes; or similar living arrangements.

(*Id.* at 29.) The Policy does not define the term "nursing care and related services" as used in the Policy's definition of nursing home.

2

Lindquist currently suffers from Alzheimer's disease and her daughter, Geary, had Lindquist admitted to the Cottages in the Fall of 2005. Geary decided on the Cottages because it "specialized in Alzheimer's, and that's what I was looking for." (*Id.* at 218.) Geary never inquired into what type of facility the Cottages was, never inquired into what type of license the Cottages had, nor did she inquire into whether the facility qualified as a nursing home as defined by the Policy. (*Id.* at 218-19, 225-28, 236.) She was "simply looking for the facility that [she] thought was best for [her] mother." (*Id.* at 218-19.)

The Cottages is licensed as an "assisted-living facility type B small," and is certified as a "facility for Alzheimer's disease and related disorders" under Chapter 247 of the Texas Health and Safety Code. (*Id.* at 42-45.) It is not licensed as a nursing home under Chapter 242 of the Texas Health and Safety Code.

In its residency agreement, the Cottages agrees to provide the following services to its residents:

    a) An unfurnished . . . private or companion room.
    b) Use of common areas.
    c) Three meals and snacks daily.
    d) Daily linen and towel service.
    e) Common area housekeeping service.
    f) Maintenance of the building and common areas.
    g) All utilities.
    h) 24-hour staff supervision and caregiver support.
    i) Egress door security system.
    j) Personal laundry service when staying overnight.

> k) Personal housekeeping service.
> l) Assistance with personal care as needed for dressing, bathing, and grooming.
> m) Assistance with or supervision of medication, storage, and reminders.
> n) Social recreation/activities programming.
> o) Special programming for memory disorders.

(*Id.* at 132.) Its disclosure statement refers to the Cottages as a personal-care facility. (*Id.* at 138.) Under the residency agreement, a resident and a resident's responsible party agree, "To permit the Resident to be transferred as deemed necessary by The Cottages personnel, for the health and safety of the Resident or others." (*Id.* at 133.) The general provisions of the agreement provide,

> If the Resident requires sitters or private duty nurses, the Responsible Party is free to make arrangements for additional health-related services. The Responsible Party is responsible for negotiating with an appropriate agency for services and payment . . . .
>
> The Cottages Residents must be at least semi-ambulatory, requiring no more than a one-person assist with transfers, not in need of 24-hour nursing care or routine professional or ancillary medical assistance, and not at risk to themselves or others. Failure or inability of a Resident to continue to meet the above criteria is grounds for discharge.

(*Id.* at 134.) The Cottages disclosure statement also informs potential residents and their responsible party that a medical condition requiring 24-hour nursing care could cause a temporary transfer or a permanent discharge from the facility. (*Id.* at 140.)

According to the Cottages, it is not a nursing home, and it does not "primarily provide nursing care as opposed to personal care." (*Id.* at 114, 118, 143.) There is not a registered nurse, licensed practical nurse, or licensed vocational nurse "physically on the Alzheimer's Unit 24-hours per day, 7 days per week providing nursing care and related service[s]." (*Id.* at 115). The Cottages does have a doctor available to furnish medical care in the case of an emergency, has at least one nurse employed full time, and has a nurse either on duty or on call at all times. (*Id.*) The facility's nurses are on duty from 8:00 a.m. to 5:00 p.m. weekdays and from 8:00 a.m. to 8:00 p.m. on weekends, and has nurses on call between 5:00 p.m. and 8:00 a.m. on weekdays and 8:00 p.m. and 8:00 a.m. on weekends. (*Id.* at 8.) Under its license, the Cottages can provide continuous nursing care for a short period of time. The Cottages will provide continuous and ongoing nursing care for as long as thirty days. After thirty days, if the resident needs continued nursing care, the resident or the resident's responsible party are required to make arrangements for private nursing care at their own expense, otherwise, the resident will be discharged from the facility. (*Id.* at 119, 134, 140, 143-44.)

After placing Lindquist in the Cottages, Geary sought benefits from the Policy to pay for Lindquist's stay. (*Id.* at 6.) After conducting an extensive investigation into the facility's license and services, Life Investors informed Geary that it declined to pay

5

the benefits under the Policy because it believed that the Cottages did not qualify as a nursing home as defined by the Policy. Geary filed suit on behalf of Lindquist in Texas state court alleging that Life Investors beached its contract, engaged in unfair claim settlement practices under section 541.060 of the Texas Insurance Code and section 17.46(b) of the Texas Business and Commerce Code, breached its duty of good faith and fair dealing, and failed to comply with sections 542.055-542.058 of the Texas prompt payment statute. Geary seeks both compensatory and exemplary damages.

II. Analysis

    A. Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir.

1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and produce evidence that sets forth specific facts showing there is a genuine issue for trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory

7

allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B. Discussion

In Texas, the rules of interpretation and construction generally applicable to contracts are equally applicable to insurance contracts. *See Lynch Properties, Inc. v. Potomac Insurance Company of Illinois,* 140 F.3d 622, 625 (5th Cir. 1998)(citing *National Union Fire Insurance Company v. CBI Industries, Inc.,* 907 S.W.2d 517, 520 (Tex. 1994)). "Effectuating the true intent of the parties as expressed in the insurance policy is the primary concern of the court." *Id.* at 626 (citing *Forbau v. Aetna Life Insurance Company,* 876 S.W.2d 132, 133 (Tex. 1994)). The Court construes the policy to give effect to each of its provisions and avoids rendering any term a nullity. *Id.* However, no word, phrase, sentence, or section should be construed in a vacuum; rather, the Court must consider each part of a policy in its proper context. *Id.* (citing *Forbau,* 876 S.W.2d at 132-33). The Court should also uniformly interpret policy provisions that are similar across jurisdictional borders. *See National Union Fire Insurance Company,* 907 S.W.2d at 522 ("Courts usually strive for

8

uniformity in construing insurance provisions, especially where, as here, the contract provisions at issue are identical across the jurisdictions."). "Thus, when no Texas court has interpreted a particular provision, [the Court] look[s] to the courts of other states for guidance . . ." as to how Texas may interpret the provision. *Lynch Properties,* 140 F.3d at 626 (citing *Dickson v. State Farm Lloyds,* 944 S.W.2d 666, 668 (Tex.App.—Corpus Christi [13th Dist.] 1997, no pet.)(looking to other jurisdictions in interpreting same insurance provision).

Provisions of an insurance contract are not ambiguous if they can be given a "definite and certain legal meaning." *National Union Fire Insurance Company,* 907 S.W.2d at 520. "Disagreement over the meaning or interpretation of a term is not sufficient to make a provision ambiguous or to create a question of fact." *Lynch Properties,* 140 F.3d at 626. "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *National Union Fire Insurance Company,* 907 S.W.2d at 520. Whether an insurance contract is ambiguous is a question of law for the Court to decide. *Id.* If it is determined that an insurance contract is ambiguous, then the Court "must resolve the uncertainty by adopting the construction that most favors the insured . . . even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection

9

of the parties' intent." *National Union Fire Insurance Company v. Hudson Energy Company,* 811 S.W.2d 552, 555 (Tex. 1991).

Contrary to Geary's assertion, the Policy's definition of the term "nursing home" is not ambiguous. In plain terms, the Policy requires a facility to be "licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients," and it lists certain services that, at a minimum, a facility must provide. On its face, the definition is not susceptible to more than one interpretation. Either the facility is licensed by the appropriate state agency to primarily provide nursing care and related services or it is not. And the facility either provides the minimum listed services in the definition or it does not.

Two other courts have reviewed this identical language and concluded that as a matter of law it is not ambiguous. *See Gillogly v. General Electric Capital Assurance Company,* 430 F.3d 1284, 1291 (10th Cir. 2005); *Gregg v. IDS Life Insurance Company of New York,* 178 Misc. 2d 895, 898 (N.Y.Sup.Ct. 1998), *affirmed,* 261 A.D.2d 799 (N.Y. App. Div. 1999). Neither party has brought to the Court's attention any Texas court that has interpreted this provision, and the Court is not aware of any. Thus, the Court, being mindful that Texas prefers uniformity in the interpretations of insurance provisions that are identical across jurisdictions,

concludes that the definition of what constitutes a nursing home is not ambiguous.

It is undisputed that the Cottages is licensed as an assisted-living facility and not as a nursing home. At the time Lindquist entered into this insurance contract and at the time she submitted her claim for benefits, Texas regulated nursing homes and related institutions and assisted-living facilities in separate, but complementary, statutes. See Chapter 242 of the Texas Health and Safety Code regulating "Convalescent and Nursing Homes and Related Institutions" and Chapter 247 of the Texas Health and Safety Code regulating "Assisted Living Facilities."

It is also undisputed that the Texas Department of Aging and Disability Services ("the Department") is charged with promulgating regulations applicable to nursing homes and assisted-living facilities. Under section 247.026 of the Texas Health and Safety Code, the Department is charged with promulgating regulations that prescribe minimum standards for assisted-living facilities. One of the requirements of the statute is that the Department's minimum standards must "clearly differentiate an assisted-living facility from an institution required to be licensed under Chapter 242." TEX. HEALTH & SAFETY CODE § 247.026(b)(1).

The Department's regulations set out the requirements an institution "must meet in order to be licensed as a nursing facility and also qualify to participate in the Medicaid program."

40 Tex. Administrative Code § 19.1(b). The Department defines a "nursing facility/home" as "an institution that provides organized and structured nursing care and service, and is subject to licensure under Health and Safety Code, Chapter 242." 40 Tex. Administrative Code § 19.101(90).

On the other hand, an assisted-living facility is defined by the Department as "an establishment that furnishes, in one or more facilities, food and shelter to four or more persons who are unrelated to the proprietor of the establishment; and provides personal care services." 40 Tex. Administrative Code § 92.2(b)(1). Personal-care services are defined as:

> Assistance with meals, dressing, movement, bathing, or other personal needs or maintenance; the administration of medication or the assistance with or supervision of medication; or general supervision or oversight of the physical and mental well-being of a person who needs assistance to maintain a private and independent residence in the facility or who needs assistance to manage his or her personal life, regardless of whether a guardian has been appointed for the person.

40 Tex. Administrative Code § 92.3(32). According to the Department, the general characteristics of an assisted-living resident may include:

> (1) exhibit[ing] symptoms of mental or emotional disturbance, **but is not considered at risk of imminent harm to self or others**;
> (2) need[ing] assistance with movement;

(3) requir[ing] assistance with bathing, dressing, and grooming;
(4) requir[ing] assistance with routine skin care, such as application of lotions, or treatment of minor cuts and burns;
(5) need[ing] reminders to encourage toilet routine and prevent incontinence;
(6) **requir[ing] temporary services by professional personnel**;
(7) need[ing] assistance with medications, supervision of self-medication, or administration of medication;
(8) requir[ing] encouragement to eat or monitoring due to social or psychological reasons of temporary illness;
(9) be[ing] hearing impaired or speech impaired;
(10) be[ing] incontinent without pressure sores;
(11) requir[ing] established therapeutic diets;
(12) requir[ing] self-help devices; and
(13) need[ing] assistance with meals.

40 TEX. ADMINISTRATIVE CODE § 92.2(c)(emphasis added). Notably absent from that list of characteristics is any need for organized and structured nursing care and related services.

While the Department's regulations permit a healthcare professional to provide services within the scope of that professional's practice and license to a resident of an assisted-living facility, "a facility is not authorized to provide ongoing services comparable to the services available in a nursing facility licensed under Chapter 242, Health and Safety Code." 40 TEX. ADMINISTRATIVE CODE § 92.2(b)(2). Residents may, however, contract to have home-health services delivered to them at the assisted-living facility. *Id.* Thus, the regulations follow the mandate of the Texas statutes

13

in clearly distinguishing a nursing facility/home from an assisted-living facility.

Geary argues that the Department's regulations defining a nursing-home facility and an assisted-living facility should not be considered because the regulations were not in existence at the time the contract was made and because there is no reference to them in the Policy. Geary contends that "subsequent changes to the law cannot defeat [Lindquist's] substantive rights that inured to her when the Policy was issued." (Pls.' Br. at 9.) She urges the Court to accept a definition of "nursing care" provided in *Transport Insurance Company v. Polk,* 400 S.W.2d 881, 884 (Tex. 1966), which she contends was the law when the Policy was issued and is still the law today. Geary argues that since the Cottages' services mirror much of what is contained in the *Transport* definition, the Court should conclude that the Cottages does primarily engage in nursing care and related services. (*Id.*)

Geary's argument misses the mark. Even if the Cottages provides all of the services listed in the *Transport* definition, it is still not a facility that is licensed by the appropriate state agency to primarily engage in providing nursing care and related services. That notwithstanding, assuming, without deciding, that the regulations governing nursing-home facilities and assisted-living facilities were not in effect when Lindquist bought the Policy, the regulations do not confer or alter any substantive

14

right of the contracting parties and do not alter the substance of the Policy. The definition of a nursing home in the Policy refers to and is dependant on the license the facility has from the appropriate state licensing agency. That necessarily implies that the regulations issued by an appropriate state licensing agency governing the license a facility may have and governing what services that facility may offer under its license is relevant to the Policy. Moreover, the regulations at issue in this case inform the contracting parties of which facilities in Texas would qualify as a nursing home under the Policy, which is precisely how they contracted.

The fact that those regulations may have come into existence after the Policy was made and may change while the Policy is in effect is of no moment because the regulations do not substantively alter the definition of a nursing home under the Policy nor do they substantively alter Lindquist's right to benefits once she is placed into a facility that qualifies as a nursing home under the Policy. That remains unaltered; what may change, however, is what facilities qualify under that definition based on the regulations in effect at the time Lindquist is placed into a facility and applies for benefits under the Policy.

The Cottages is specifically licensed by statute and regulation as an assisted-living facility, and according to the definitions in the regulations, it is licensed to primarily provide

15

personal-care services to its residents—not nursing care or services related to nursing care.  The Cottages readily admits that it is not a nursing home and that it does not primarily provide nursing services to its residents.  Its disclosure statement informs residents that should they require ongoing nursing services, they may be temporarily removed or permanently discharged from the facility.  Its residency agreement lists all of the standard services it agrees to provide, none of which includes providing any kind of nursing service.  While the Cottages does have nursing services available, it is intended to only be temporary in nature, lasting no more than thirty days.  And its residency agreement allows for its residents to privately contract, at their own expense, for ongoing and continued nursing services should they be in need of such services.

Thus it is clear, in compliance with Texas statutes, regulations, and its license, the primary focus of the Cottages is to provide personal-care services to its residents—not nursing or related services.  *See also Gillogly,* 430 F.3d at 1291 (holding under an identical definition of nursing home, a residential-care home that could not routinely provide nursing care under Oklahoma statutes was not a nursing home); *Gregg,* 261 A.D.2d at 799 (applying identical definition, holding apartments licensed to provide home-care services was not a nursing home under New York law and thus not a nursing home under policy definition).

16

Finally, because the Court concludes that the Cottages is not licensed to primarily provide nursing care and related services to its residents, the Court need not decide whether the services the Cottages does provide meet the minimum listed services in the Policy. The Policy allows for facilities to qualify as nursing homes in only one way, it must be **both** licensed to primarily provide nursing and related services and it must provide the minimum listed services in the Policy. *See also Gillogly,* 430 F.3d at 1293. Because the Cottages is not licensed by the Department "to engage primarily in providing nursing care and related services" to its residents, it is not a nursing home as defined by the Policy—regardless of whether it provides all of the minimum listed services in the Policy. Accordingly, Life Investors did not breach its contract or its duty of good faith and fair dealing, engage in unfair claim settlement practices, or fail to comply with the Texas prompt payment statute when it denied Geary's request for benefits for Lindquist's stay at the Cottages.

III. Conclusion

For the foregoing reasons, the Court GRANTS Life Investors' motion for summary judgment. Because all of the claims in this case hinge on whether the Cottages is a nursing home as defined by the Policy, and because the Court concludes that, as a matter of

17

law, the Cottages is not a nursing home under Texas law and as defined by the Policy, Life Investors is entitled to JUDGMENT AS A MATTER OF LAW on all of Geary's claims.

SIGNED August 13, 2007.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE